UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RAHEL A. DEMISSIE,**<br><br>  **Plaintiff,**<br><br>  v.<br><br>**STARBUCKS CORPORATE OFFICE AND HEADQUARTERS,**<br><br>  **Defendant.** | Civil Action No. 13-2002 (ESH) |

## MEMORANDUM OPINION

Plaintiff Rahel A. Demissie filed this action on December 18, 2013, against Starbucks Corporate Office and Headquarters ("Starbucks") based on a claim of unlawful employment actions motivated by discrimination on the basis of race, gender, or national origin. (*See* Compl., Dec. 18, 2013 [ECF. No. 1].) The parties engaged in a lengthy series of settlement conferences under the auspices of Magistrate Judge Robinson, but they disagree on whether a settlement was reached during a settlement conference held on November 6, 2014.

Plaintiff, claiming that no settlement had been reached, renoticed depositions for December 5, 2014, but defendant did not attend. Plaintiff filed a motion to compel depositions and extend discovery on December 10, 2014. (*See* Pl.'s Mot. to Compel, Dec. 10, 2014 [ECF No. 33].) On December 11, 2014, Starbucks filed a motion to enforce settlement agreement (*see* Def.'s Mot. to Enforce, Dec. 11, 2014 [ECF No. 34]), an opposition to plaintiff's motion to compel (*see* Def.'s Opp. to Mot. to Compel, Dec. 11, 2014 [ECF No. 35]), and a motion for protective order. (*See* Def.'s Mot. for Protect. Order, Dec. 11, 2014 [ECF No. 36]). The Court held an evidentiary hearing on February 6, 2015. Kelly Scindian, attorney for Starbucks, and

Richard Salzman, attorney for Ms. Demissie, provided testimony about the alleged settlement agreement, and several emails exchanged between counsel before and after the November 6, 2014 settlement conference were admitted into evidence.  Mr. Salzman did not provide testimony on direct examination, but represented that he adopted his emails relating to the settlement as true statements.  (*See* Evid. Hr'g Tr. at 49-50, Feb. 6, 2015 [ECF No. 43] ("Tr.").)  Based on the testimony of the witnesses, the exhibits, and the entire record, the Court makes the following findings of fact and conclusions of law.

## BACKGROUND

Ms. Demissie, who was born in Ethiopia, filed a *pro se* lawsuit against Starbucks alleging that the company violated Title VII by failing to "equally apply [its] rules and regulations" pertaining to pay raises and work scheduling "to all employees regardless of race, gender, or national origin" and by retaliating against her for "report[ing] the situation" to human resources.  (Compl. at 2-3.)  On February 25, 2014, the Court granted defendant's partial motion to dismiss, dismissing plaintiff's claims of race and gender discrimination and retaliation relating to the reduction in hours on the grounds of failure to exhaust administrative remedies.  (*See* Mem. Op. and Order, Feb. 25, 2014 [ECF. No. 12] at 5.)  The remaining allegations that Starbucks 1) discriminated against plaintiff on the basis of national origin by failing to provide Ms. Demissie with regular performance reviews and pay increases, and 2) retaliated against plaintiff by informing her that she and her sister could no longer work at the same Starbucks store, were permitted to proceed.  (*See id.*)

On April 8, 2014, the Court held an initial scheduling conference and discovery was scheduled to close on August 24, 2014.  (*See* Min. Entry, Apr. 8, 2014.)  The discovery period was subsequently extended to December 20, 2014.  (*See* Min. Order, Nov. 5, 2014.)  The Court

also referred the case to Magistrate Judge Robinson for settlement discussions.[1]  (*See* Order Referring Case, Apr. 8, 2014.)  The parties met for mediation on four occasions: May 27, 2014, June 12, 2014, June 25, 2014, and November 6, 2014.  The first three settlement conferences were mediated by Magistrate Judge Robinson, but the final conference was mediated by her term law clerk.  (*See* Tr. at 2-3.)

The parties initially met for mediation on May 27, 2014.  During this conference, the parties discussed plaintiff's claims and allegations and potential terms of the settlement agreement.  (*See* Tr. at 21 & 23.)  Plaintiff proposed a specific amount to settle the claims, and defendant stated that any settlement agreement between the parties would be contingent on the plaintiff's agreement to voluntarily resign from her position at Starbucks, to not reapply, to release all claims against defendant, and to maintain confidentiality of all material terms.  (*See* Tr. at 23.)  The settlement amount proposed by plaintiff was not accepted.  (*See* Tr. at 24.)  Both parties agree that they did not discuss tax treatment of the settlement amount at this mediation. (*See* Tr. at 23 & 57.)

During the second mediation, held on June 12, 2014, the parties were unsure how a potential settlement agreement would affect plaintiff's independent workers' compensation claim.  (*See* Tr. at 24.)  Defendant again insisted on the terms discussed at the previous settlement conference: voluntary resignation and no rehire, release of all claims, and confidentiality of material terms.  (*See* Tr. at 58-59.)  The parties did not discuss tax allocation during the second mediation.  (*See* Tr. at 57.)

---

[1] At the Court's suggestion, plaintiff consulted with Richard Salzman, an experienced Title VII lawyer.  As a result, Mr. Salzman graciously agreed to enter his appearance on plaintiff's behalf.

3

The third mediation was held on June 25, 2014.  The parties discussed plaintiff's workers' compensation claim, and plaintiff represented that any settlement with an agreement to release Starbucks of all claims would need to carve out an exception for her workers' compensation claim.  (*See* Tr. at 25.)  Defense counsel agreed to this term and reiterated defendant's requirements for settlement: voluntary resignation and no rehire, release of all claims excluding the workers' compensation claim, and confidentiality of material terms.  (*See* Tr. at 25.)  Again, how the settlement amount would be taxed was not brought up by either party.  (*See* Tr. at 25; 57.)

On September 17, 2014, Mr. Salzman, counsel for plaintiff sent an email to defense counsel and proposed another settlement amount.  (*See* Evid. Hr'g, Feb. 6, 2014, Def.'s Ex. 1.)  In his email, Mr. Salzman addressed attorney's fees and indicated that the settlement amount would include his fees discounted at a significant rate.  (*See id.*)  Defense counsel, Ms. Scindian, responded the following day, inquiring whether the offer included plaintiff's acceptance of the voluntary resignation and no rehire terms previously discussed.  (*See id.*)  On September 25, 2014, Mr. Salzman replied that his client would agree to resign, not seek reemployment, and release all claims except the workers' compensation claim.  (*See id.*)

In the meantime, preparation for trial continued.  Plaintiff notified defendant on November 3, 2014, of upcoming depositions that would need to be completed before the close of discovery in December 2014.  (*See* Def.'s Mot. to Enforce at Ex. A.)

The parties met for a fourth time for mediation on November 6, 2014.  Magistrate Judge Robinson was on vacation on this date, and in lieu of rescheduling the settlement conference, she

instructed her law clerk, with the consent of the parties, to facilitate the discussion.[2] (*See* Tr. at 14.) The parties began the mediation by briefing the law clerk on prior discussions. (*See* Tr. at 28.) Plaintiff's counsel indicated to the law clerk that defendant had said the settlement must include "the release [of] claims, carving out Ms. Demissie's Worker's Compensation claim, which was still pending, Ms. Demissie's voluntary resignation and no rehire." (Tr. at 29.) This summary of settlement negotiations did not include a discussion regarding tax allocation of the settlement amount. (*See* Tr. at 28.) Defense counsel then informed plaintiff that defendant had rejected the emailed settlement amount and proposed a counteroffer, which plaintiff rejected. (*See* Tr. at 29.)

The law clerk then separated the parties, leaving defense counsel in the chambers conference room and removing plaintiff and Mr. Salzman to the chambers waiting area. (*See* Tr. at 29 & 52.) The law clerk moved between the parties conveying offers and counteroffers. He did not indicate at any point that there were additional terms suggested by the parties. (*See* Tr. at 31.) Defendant proposed a final settlement offer, and a few minutes later, the law clerk, plaintiff, and Mr. Salzman returned to the conference room. According to Ms. Scindian, the law clerk said, "We have a deal." (Tr. at 32.) Mr. Salzman does not remember whether the law clerk said this, but remembers that the parties thanked each other for being flexible. (*See* Tr. at 52.) Both parties agree that Ms. Scindian shook hands with plaintiff and Mr. Salzman. (*See* Tr. at 32 & 55.)

With the settlement amount agreed upon, the parties sat down at the conference table and discussed staying discovery pending the parties filing a stipulation for dismissal. (*See* Tr. at 34.)

---

[2] The development of a complete record was hampered by Magistrate Judge Robinson's refusal to permit her law clerk to testify at the February 6, 2015 evidentiary hearing despite requests by counsel and the Court.

Ms. Scindian agreed to draft a written agreement of the settlement. (*See* Tr. at 53.) At that time, Mr. Salzman mentioned for the first time that the settlement amount owed to his client should be submitted on a 1099 form because the settlement amount should not be considered, or taxed, as back wages. (*See* Tr. at 34.) According to plaintiff, Ms. Scindian "either agreed to [the tax allocation], or agreed to look into it." (Pl.'s Reply, Dec. 12, 2014 [ECF No. 37] at 2.) Ms. Scindian does not remember how she responded to Mr. Salzman's request. (*See* Tr. at 35.)

Following the November 6, 2014 settlement conference, counsel for the parties engaged in an email disagreement over what was said at the mediation regarding tax allocation and whether the parties reached an agreement on all material terms. On November 14, 2014, Ms. Scindian emailed Mr. Salzman regarding the portion of the settlement amount attributable to attorney's fees and informed him that "a majority of the settlement amount to your client must be attributed to back wages given the basis of her claims, and thus cannot be 1099'd." (Def.'s Mot. to Enforce at Ex. B.) Mr. Salzman responded that same date that this tax allocation was "not acceptable" because they had "specifically talked about this and agreed at the mediation." (Pl.'s Mot. to Compel at Ex. 2.) Ms. Scindian replied that she had agreed to look into the 1099 issue, but confirmed that part of the settlement amount must be attributable to back pay. (*See id.*) Disagreeing with Ms. Scindian's memory of events, Mr. Salzman asserted that, "we were crystal clear and you were not agreeing to look into it; you agreed to it. It is not a question of whether she pays taxes on it; she always pays taxes on it; it's a question of whether or not FICA comes out. So the other option is to gross up the settlement by the small amount that she will have to pay in FICA. If that is the option you prefer, let me know." (*Id.*) Ms. Scindian responded that the parties had "reached the settlement amount before any discussion of taxes occurred." (*Id.*) On November 17, 2014, Mr. Salzman asked Ms. Scindian to propose a percentage to allocate to

back wages. (*See id.*)  The attorneys proceeded to negotiate the portion of the settlement that would be allocated as back wages. (*See id.*)  On November 18, 2014, Mr. Salzman agreed to recommend to his client defendant's proposal that less than $1,000 of the settlement amount would be attributed to back wages.[3]  (*See id.*)

On November 20, 2014, Mr. Salzman emailed that his client would not agree to this tax allocation and Ms. Demissie was "quite frustrated with this change in position by [defendant]." (Def.'s Mot. to Enforce at Ex. C.)  Mr. Salzman indicated to Ms. Scindian on November 24, 2014, that a change in plaintiff's personal circumstances made it impossible for her to voluntarily resign from her position at Starbucks. (*See* Mot. to Enforce at 6.)  Ms. Scindian later learned that the change in Ms. Demissie's circumstances was that her workers' compensation attorney had advised her that voluntarily resigning from her position could compromise her claim. (*See* Tr. at 37.)[4]

Intending for the litigation to recommence, Mr. Salzman re-noticed depositions of defendant's employees to be held in early December. (*See* Def.'s Mot. to Enforce at Ex. C and Ex. D.)  Counsel discussed the status of the settlement by phone, and Ms. Scindian followed up by email on December 1, 2014.  She wrote that the parties "had negotiated a settlement in principle on Nov. 6," but she was trying to schedule witnesses for depositions in December. (Pl.'s Mot. to Compel at Ex. 5.)  Ms. Scindian also indicated that her interpretation of the settlement break down was that plaintiff had revoked her agreement to voluntarily resign from

---

[3] Assuming that FICA and Medicare taxes had to be paid on the $1,000, plaintiff would have received approximately $73.00 less in settlement proceeds. (*See* Tr. at 45.)

[4] In her motion to compel, plaintiff stated that she "no longer wishes to enter into the settlement on the terms previously discussed" because 1) defendant attempted to change the terms of the tax allocation provision, and 2) plaintiff "learned that the provision requiring her voluntary resignation from Starbucks . . . could jeopardize portions of a pre-existing workers compensation claim." (Pl.'s Mot. to Compel at 1-2.)

her position.  (*See id*.)  On December 2, 2014, Mr. Salzman responded that his interpretation of the dispute was that defendant "reneged on the material term we agreed upon at the mediation, regarding the allocation of the settlement payment as 1099 damages, rather than as w-2 wages." (Pl.'s Mot. to Compel at Ex. 2.)

## LEGAL STANDARD

"It is well established that federal district courts have the authority to enforce settlement agreements entered into by the litigants in cases pending before them." *Ulliman Schutte Constr., LLC v. Emerson Process Mgmt. Power & Water Solutions*, No. 02-1987, 2007 WL 1794105, at *3 (D.D.C. June 19, 2007). When there is a genuine factual dispute as to whether the parties agreed to a binding settlement, the Court must hold an evidentiary hearing in which the parties are afforded the opportunity for cross-examination.  *See United States v. Mahoney*, 247 F.3d 279, 285 (D.C. Cir. 2001).  The moving party bears the burden of proving by clear and convincing evidence that the parties reached a binding agreement.  *See Samra v. Shaheen Bus. and Inv. Grp., Inc.*, 355 F. Supp. 2d 483, 493 (D.D.C. 2005) (citing *Quijano v. Eagle Maint. Servs., Inc.*, 952 F. Supp. 1, 3 (D.D.C. 1997)). For a contract, written or oral, to be enforceable under D.C. law, the court must find that there was "(1) an agreement to all material terms, and (2) intention of the parties to be bound." *Duffy v. Duffy*, 881 A.2d 630, 634 (D.C. 2005).

Which of the parties' agreement terms are material is a question of fact.  *See, e.g., Queen v. Schultz*, 747 F.3d 879, 885 (D.C. Cir. 2014).  Terms that are "not necessary for the parties to understand how they are expected to perform the contract itself" are not considered material. *Tauber v. Quan*, 938 A.2d 724, 730 (D.C. 2007).  For example, terms that were not discussed by the parties during negotiations, but are only brought up after-the-fact, may be deemed immaterial.  *See Dyer v. Bilaal*, 983 A.2d 349, 358 (D.C. 2009) (finding that confidentiality was

not a material term in part because the parties had not discussed confidentiality while negotiating the settlement). Whereas, courts have found that the amount to be paid and the release of liability are material terms to a settlement agreement. *See, e.g., Wise v. Riley* 106 F. Supp. 2d 35, 39 (D.D.C. 2000). Thus, courts make a determination of which terms are material on a case-by-case basis.

If the court finds that the parties agreed as to all material terms orally, the court must also determine whether the parties intended to be bound by their words alone. *See Perles v. Kagy*, 473 F.3d 1244, 1249 (D.C. Cir. 2007). The parties did not intend to be bound if "either party knows or has reason to know that the other party regards the agreement as incomplete." *Perles*, 473 F.3d at 1249. "[T]he fact that the exact language of [a] written settlement agreement had not been finalized does not demonstrate that the parties did not intend to be bound by their agreement." *Varga v. Baker*, No. 92-5064, 1993 WL 20073, at *1 (D.C. Cir. Jan. 5, 1993). To determine whether the parties intended to be bound, the court may examine written materials, oral expressions, and the actions of the parties, including conduct that occurred after the alleged oral agreement. *See Miller v. Holzmann*, 471 F. Supp. 2d 122, 124-25 (D.D.C. 2007).

## ANALYSIS

Based on the testimony and exhibits admitted at the evidentiary hearing and the entire record, the Court has concluded that Starbucks has established by clear and convincing evidence that the parties reached an oral agreement as to all material terms of a settlement agreement on November 6, 2014, and they intended to be bound by that agreement. Accordingly, the Court holds that the parties entered into a binding settlement agreement that must be enforced.

## I.     MATERIAL TERMS

The parties agree on most facts pertaining to the mediation sessions and subsequent discussions.  They agree that Starbucks reiterated at every mediation session the terms it considered to be material: voluntary resignation and no rehire, release of all claims excluding the workers' compensation claim, and confidentiality of material terms.  These terms were also discussed in the September 2014 email exchange between the parties.

However, the parties disagree on plaintiff's material terms.  Plaintiff argues that the tax treatment of the settlement amount is a material term even though it was only discussed for the first time after the parties shook hands at the close of the November 6, 2014 mediation.  (*See* Tr. at 55.)  Plaintiff argues that as a result, the settlement should not be enforced for two reasons: 1) defendant revoked its promise to attribute the entire settlement amount as 1099 damages; or 2) defendant promised to look into the tax allocation question, indicating that an agreement on all material terms had not been reached. (*See id.* at 11-12.)

In support of plaintiff's position that the tax allocation was a material term, Mr. Salzman noted that tax allocation is almost never discussed prior to reaching a settlement amount.  (*See* Tr. at 55.)  He stated that in his experience with settlement discussions, "[t]here are almost always many additional points that come up.  There's usually an employer ask[ing] for a non-disparagement clause. Employers almost always put in something called a liquidated damages clause. They put in arbitration provisions. There are arguments over tax allocation and indemnification clauses." (Tr. at 56.)  However, this anecdotal information does not necessarily support plaintiff's position because all of those terms might be considered immaterial under the particular circumstances of those cases.  Plaintiff also argues, contrary to the case law, that the failure to discuss tax allocation during any of the previous settlement negotiations does not

negate the materiality of the allocation issue. *See Blackstone v. Brink*, 63 F. Supp. 3d 68, 77 (D.D.C. 2014) (citing *Dyer*, 983 A.2d at 358). In fact, tax allocation has been determined to be ministerial, relating more to the administration of the settlement than to the agreement itself. *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1003 (D.C. 2008) ("The enforceability of the agreement comes from the definitive character of the *obligation* to perform, not a precise description of the ways in which the obligation might be fulfilled.")

Under the circumstances of this case, the facts weigh heavily in favor of defendant's position. The tax treatment of the settlement amount was not mentioned prior to the end of the November 6, 2014 mediation and, even then, only after the parties reconvened after reaching an agreement and shook hands. And tax allocation does not affect defendant's obligation to perform under the agreement, but merely how payment should be made.

Significantly, the lack of materiality is further demonstrated by the small amount of money at stake. The Court can imagine a scenario in which the tax allocation of the settlement could create a substantial tax consequence. However, this is not such a case. As Mr. Salzman pointed out in his November 15, 2014 email, Ms. Demissie is required to pay taxes on the settlement regardless of whether it is attributed as back wages or 1099 damages. The only difference between the two allocations is that plaintiff must pay FICA and Medicare taxes, which Mr. Salzman admits are quite small. (*See* Pl.'s Mot. to Compel at Ex. 2 (Mr. Salzman emails, "So the other option is to gross up the settlement by the small amount that she will have to pay in FICA."); *see also supra* note 3.) In their negotiations following the November 6, 2014 mediation, the lawyers' conduct indicates that they believed that the issue could be worked out. Indeed, defendant proposed that less than $1,000 of the settlement would be attributed to back wages, and Mr. Salzman agreed to recommend this allocation to his client. It is therefore not

credible to claim that this negligible amount attributed as wages could be a material term or that it would be a deal breaker.[5]

The subsequent events further suggest that the tax allocation issue was not the true bone of contention. Rather, the alleged detrimental effect plaintiff's compliance with the settlement agreement would have on her workers' compensation case appears to have been the real catalyst for the breakdown. Mr. Salzman was willing to compromise on the tax allocation issue, agreeing to present a proposed allocation to his client. However, it was only when Ms. Demissie learned that her workers' compensation claim might be negatively affected that she communicated to defendant that the agreement reached on November 6, 2014, would not be honored.[6]

As Mr. Salzman noted during the evidentiary hearing, many mediators encourage the parties to write down the material terms on paper and sign it. (*See* Tr. at 55.) Unfortunately, this desirable practice was not followed on November 6, 2014. Regardless, the Court is able to conclude that the parties reached agreement on all material terms: the settlement amount, plaintiff's agreement to voluntarily resign and not reapply, plaintiff's release of all claims, excluding the worker's compensation claim, and confidentiality of all material terms.

## II. INTENTION TO BE BOUND

Likewise, the Court concludes that the parties intended to be bound by their oral settlement agreement. In their September 2014 email exchange, counsel for the parties discussed

---

[5] It represents less than 10% of the settlement amount.

[6] Another lawyer, not Mr. Salzman, represents plaintiff in her worker's compensation case. Based on the Court's observations, this division of labor has frustrated settlement. In fact, in addition to this settlement blowing up, all subsequent attempts at settlement have failed, and Mr. Salzman has moved to withdraw based on irreconcilable differences. (Mot. of Richard Salzman to Withdraw as Plaintiff's Counsel, June 24, 2015 [ECF No. 42].) Plaintiff has opposed this motion. (Pl.'s Response and Opp'n to Pl.'s Counsel's Mot. to Withdraw, July 6, 2015 [ECF No. 44].)

the material terms of a potential settlement. Mr. Salzman wrote on September 25, 2014, that plaintiff would agree to the terms outlined by defendant if the settlement amount was agreed upon and defendant agreed to carve out plaintiff's workers' compensation case. While this monetary offer was ultimately rejected, these emails show the intention of the parties to be bound by the terms that were ultimately accepted on November 6, 2014.

Further, counsel and plaintiff reconvened after reaching a mutually agreeable settlement amount and shook hands, confirming their agreement to the material terms of the settlement. The parties then discussed staying further litigation and who would be responsible for drafting the settlement agreement. These actions are consistent with an intent to be bound by the terms discussed in the previous mediation sessions and the finalized settlement amount.

Similarly, the actions of the parties following the November 6, 2014 mediation indicate that the parties had intended to be bound by the agreement they had reached. Although in her November 24, 2014 email Ms. Scindian stated that she was looking into scheduling witnesses for depositions in December, she also indicated that she believed the parties had reached a settlement in principle. When questioned on what she meant by this, Ms. Scindian responded that she "meant that we reached an agreement on the material terms of the settlement. We just hadn't hammered out the actual agreement." (Tr. at 44.) The fact that Ms. Scindian was "contemplating in part that discovery may go forward" does not demonstrate that she had not intended defendant to be bound by the oral agreement on November 6, 2014, because, as she made clear, she "was also contemplating whether or not we could enforce the settlement." (*Id*. at 45.)

Indeed, there is no evidence that after shaking hands at the November mediation, either party knew or had reason to know that the other party regarded the agreement as incomplete. On

13

the contrary, the stay of litigation the parties initiated at the close of the November 6, 2014 mediation suggests that both parties believed that they had reached an enforceable agreement. Again, it was only after Ms. Demissie concluded that the agreement she had reached with Starbucks might compromise her workers' compensation case that she sought to recommence litigation.  In this Court's opinion, this after-the-fact change of heart cannot serve to undo the oral agreement that had been reached on November 6, 2014.  *See Blackstone*, 63 F. Supp. 3d at 83 ("[B]elated objections do not convince the Court that Plaintiff[] did not intend to be bound by the agreement.") (citing *Carlson v. Farm Mutual Automobile Insurance Co.*, 76 F. Supp. 2d 1069, 1076 (D. Mont. 1999)).  Thus, the Court concludes that the parties intended to be bound by their oral agreement on the material terms of the settlement.

## CONCLUSION

For the foregoing reasons, the Court finds that the parties reached a binding, oral settlement agreement on November 6, 2014, and will grant defendant's motion to enforce settlement.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   July 13, 2015